**J. KINDERMAN & SONS d/b/a Brite Star Manufacturing Co., Plaintiff,**

v.

**MINAMI INTERNATIONAL CORP., Defendant.**

**No. Civ.A. 98–2640.**

United States District Court,
E.D. Pennsylvania.

July 29, 1998.

Ms. Roberta Jacobs–Meadway, Panitch, Schwarze, Jacobs & Nadel, Philadelphia, PA, for Plaintiff.

Jane Ungaro & Neil M. Zipkin, Amster, Rothstein & Ebenstein, New York City, Barry L. Cohen, Leonard, Tillery & Sciolla, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

This memorandum addresses defendant Minami International Corporation ("Minami")'s motion for a preliminary injunction mandating that plaintiff J. Kinderman & Sons D/B/A Brite Star Manufacturing Company ("Brite Star") direct the United States Customs Service ("Customs") not to detain, seize or otherwise interfere with importation of Minami's holiday light sets. These light sets, which are expected to arrive in U.S. ports within the next month to two months, are the subject of the initial action brought by Brite Star on May 21, 1998 for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and Pennsylvania law. For the reasons that follow, I will deny the motion for preliminary relief.

Brite Star alleges that it holds a validly registered trademark for the term "NET LITES" to identify a type of Christmas or holiday light set it sells, and that defendant Minami manufactures and sells a similar product, which is offered through the same channels of trade, and which it identifies as a "NET LIGHT". Brite Star alleges that Minami uses the term "NET LIGHT" on its packaging as a trademark, and that such use constitutes trademark infringement under the Lanham Act, 15 U.S.C. § 1051 et seq. and Pennsylvania law, as well as unfair competition under 15 U.S.C. § 1125(a) and Pennsylvania law.

On June 16, 1998, Minami filed a counterclaim seeking a declaratory judgment that Brite Star's trademark was invalid and should be canceled because the mark is generic or descriptive without a secondary meaning. Alternatively, Minami seeks a declaratory judgment that, if the court finds the mark to be valid, Minami is using the mark not as a trademark but as a description of Minami's goods, and it is used fairly and in

good faith, as permitted by § 1115(b)(4) of the Lanham Act.[1]

On June 24, 1998, Minami filed a motion for a preliminary injunction, seeking a mandate that Brite Star direct the U.S. Customs Service not to detain any of Minami's products when they arrive in U.S. ports, as they are expected to do within the next month to two months. Minami asserts that it meets all four parts of the test for issuance of a preliminary injunction: that it is likely to succeed on at least one defense to Brite Star's claims; that it will suffer irreparable harm to its business reputation if its products are detained, even temporarily, by the Customs Service; that Brite Star has an adequate legal remedy in the event Brite Star prevails on its infringement claim after a full trial on the merits, but that Minami has no adequate legal remedy if the injunction is denied; and that the public interest is served by grant of the injunction. Brite Star argues in response that it holds a presumptively valid (i.e., neither generic nor descriptive without secondary meaning) trademark; that Minami uses the term "NET LIGHT" or "NET LIGHTS" as a trademark; and that Minami can show no irreparable harm flowing from the denial of preliminary relief.

I held a hearing on Minami's motion on June 30, 1998, at which time Minami offered the testimony of its president, Nori Juba, and of Sandy Kinderman, CEO of Brite Star, as well as several exhibits, including one of Brite star's light sets sold with the trademark "NET LITES". Brite Star offered the testimony of Mr. Kinderman, and several exhibits, including one of Minami's similar light sets. Both parties submitted proposed findings of fact and conclusions of law.

Based on the evidence presented, I have determined that Minami has failed to make the requisite showing of irreparable harm, and is therefore not entitled to the extraordinary remedy of a preliminary injunction. Because I am denying the motion for preliminary relief, I need not and do not make detailed findings as to the several issues presented for ultimate resolution in this case. Fed.R.Civ.P. 65(d). Specifically, I make no findings regarding Minami's likelihood of success on either its counterclaims or defenses to the infringement action or Brite Star's likelihood of success on its infringement or unfair competition claims.[2] I make, however, the following findings of fact and conclusions of law necessary to support my preliminary injunction ruling.

*Findings of Fact*

Brite Star is a Philadelphia-based business, founded in 1903 and incorporated in 1932, which manufactures, imports and sells holiday decorations (Tr. 157). Minami is a manufacturer and importer of Christmas lights; the U.S. company, based in Yonkers, NY, was established in 1972 as successor to the family business established in 1908 (Tr. 40). Brite Star and Minami compete for sales of Christmas or holiday lights, and both companies market their products to the same large retail chains. The Christmas light and holiday decorations business is extremely competitive due, in part, to the short holiday selling season (Tr. 187–88). Both companies' version of the product at issue here is manufactured in China. Minami is a significantly larger company than Brite Star, with annual sales in excess of 75 million dollars (Tr. 39).

In November 1996, Brite Star began selling an electric holiday light set under the trademark "NET LITES" (Tr. 160). The "NET LITES" product consists of electric bulbs connected together in a grid to create a symmetrical sequence of lights (Def.Ex. T). The packaging for the "NET LITES" package is a cylindrical tube, which contains the actual "NET LITES" product (Pl.Ex.5).

---

1. Minami also filed counterclaims for cancellation of the registration (Count 2), damages resulting from false registration of the trademark (Count 3), intentional interference with prospective business advantage (Count 4), and intentional interference with prospective contracts (Count 5). Brite Star filed a motion to dismiss counts 3,4 and 5 of Minami's counterclaims. That motion is not addressed in this memorandum and order.

2. Subsumed in this statement are considerations regarding the strength of Brite Star's presumption of validity, genericness of the mark, descriptiveness of the mark, the nature of Minami's use of the mark, likelihood of confusion, all of which remain to be resolved after discovery or trial on the merits.

The packaging for the "NET LITES" product displays the "NET LITES" mark on the package, with the ™ symbol next to the "NET LITES" mark, indicating that Brite Star claims ownership of "NET LITES" as a mark (Pl.Ex.5). Brite Star has continuously used the "NET LITES" mark for such goods since November 1996 (Tr. 160).

Brite Star's "NET LITES" product is sold to the general public through Brite Star's retail outlet, through direct mail order catalogs, through direct response television spots, and through retail outlets such as garden centers, mass merchandisers, gift shops and department stores (Tr. 178–79).

Minami is offering for sale for the 1998 holiday season a similar product, packaged in a rectangular carton with several names, including "LIGHTS IN MOTION® NET LIGHT" and "ADD–A–SET® NET LIGHT". "LIGHTS IN MOTION" and "ADD–A–SET" are trademarks owned by Minami or its licensors (Tr. 45).

On October 9, 1996, Brite Star filed an application to register its "NET LITES" mark in the U.S. Patent and Trademark Office for "electric holiday lights" (Pl.Ex.1). Brite Star's "NET LITES" mark registered in the Patent and Trademark Office on February 24, 1998 (Tr. 163; Pl.Ex. 3). On April 23, 1998, Brite Star requested recordation of its "NET LITES" registration with the U.S. Customs Service (Tr. 170, 173; Pl.Ex.3). Brite Star received notice that the mark was officially recorded with U.S. Customs on June 9, 1998 (Tr. 173; Pl.Ex. 3A).

After Brite Star's introduction of the "NET LITES" product in 1996–97, other companies in the holiday light industry, including Minami, began to offer competing products (Def.Exs.I, J). Minami was aware of the "NET LITES" product when it began to offer its "NET LIGHTS" product to the trade in early 1998 (Tr. 74, 163–65). Minami began taking orders for products to be sold under the designations "NET LIGHTS" and "NET LIGHT" in February and March of 1998 (Tr. 66). Minami began to make its products to be sold under the designations "NET LIGHTS" and "NET LIGHT" in approximately March of 1998 (Tr. 66).

On April 29, 1998, counsel for Brite Star wrote to the Vice President of Sales for Minami to inform Minami that Minami's use of the marks "NET LIGHT" or "NET LIGHTS" infringed Brite Star's Trademark Registration No. 2,139,774, for "NET LITES" (Pl.Ex.4).

On May 11, 1998, counsel for Minami wrote advising counsel for Brite Star that Minami believed Brite Star's "NET LITES" mark was generic or descriptive of Brite Star's electric holiday lights (Pl.Ex.4A). Counsel for Minami demanded that Brite Star immediately cancel its U.S. trademark registration for "NET LITES," direct the U.S. Customs Service not to interfere with importation of Minami's product bearing the mark "NET LIGHTS" and cease advising customers of Minami that Brite Star had proprietary rights in the "NET LITES" mark (Pl.Ex.4A).

Minami began printing its packaging with "NET LIGHTS" and "NET LIGHT" in April, May and June of 1998 (Tr. 66) and began putting its first products to be sold under the designations "NET LIGHTS" and "NET LIGHT" in packages in April 1998 (Tr. 75). Most of Minami's orders for its "NET LIGHT" and "NET LIGHTS" products are FOB Hong Kong, meaning that the customer takes possession of the products in Hong Kong (Tr.49–50). Minami's factory loads the product into eight-count master cartons, which are then loaded into 40 foot containers and delivered to the customer's agent in Hong Kong, from which point the customer is responsible for delivery of the product to the United States (Tr.50).

Minami's customers require delivery of its holiday lights by a specific date in July or August of 1998. As early as July of 1998, Minami's product will arrive at various ports of entry for shipment directly to customers or to a public warehouse (Tr. 65–66). As of the date of the hearing, none of Minami's products had arrived in the United States.[3] Furthermore, none of the 200,000 units of Minami's products to be sold under the des-

3. Any reference to Minami's products is to the light sets at issue in this case.

ignation "NET LIGHTS" not yet delivered to customers in Asia were packed in boxes for shipment as of the date of the hearing (Tr.81). Minami president Juba testified to, but offered no supporting evidence of, monetary penalties if its holiday lights are not delivered on time to its customers (Tr.68–69). Juba testified that it might be subject to cancellation of orders and liability for lost profits if products are detained by Customs (Tr. 69–70). Juba testified that Minami enjoys a good reputation as a timely deliverer of goods, built up over many years; he also testified that detention of imported holiday lighting products is not uncommon, but that none of Minami's products were detained in 1997 (Tr. 68–70).

*Conclusions of Law*

■ Preliminary injunctive relief is an extraordinary remedy, to be granted only in limited circumstances. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989). To prevail on a claim for a preliminary injunction, Minami must show (1) a reasonable probability of success on the merits; (2) that it will be irreparably harmed by the denial of relief; (3) that the balance of hardships favors Minami; and, if relevant,(4) that the public interest favors the grant of the injunction. *S & R Corp. v. Jiffy Lube International*, 968 F.2d 371 (3d Cir.1992). Irreparable harm is harm that cannot be adequately compensated by an award of damages. *Miller v. American Tel. & Tel.*, 344 F.Supp. 344, 349 (E.D.Pa.1972).

■ The evidence presented by Minami simply does not establish a reasonable probability that it will suffer irreparable harm, or indeed any harm, absent judicial intervention at this stage of the proceedings. It is undisputed that none of the lights sets at issue have been detained or seized by Customs; indeed, as of the date of the hearing, none had arrived in U.S. ports. Minami presented no evidence from which I could reasonably conclude that detention or seizure is a certainty once the goods arrive.

As to the harm Minami faces in the event of a detention or seizure of goods by Customs, there was conflicting testimony (and no documentary evidence) on the issue of penalties imposed by Minami's customers for late delivery. There was also conflicting testimony (and no documentary evidence) on the issue of time and costs associated with reprinting or overlabeling the boxes. There was no evidence offered on the issue of Minami's potential liability for harm suffered by its customers who have already taken delivery of Minami's goods in Hong Kong. Moreover, to the extent that there is sufficient evidence in the record of penalties, canceled orders and lost profits resulting from a seizure of goods, such losses are compensable with money damages and are thus not irreparable.

Nor was Minami's evidence on the issue of loss of business reputation or customer goodwill adequate. Minami president Juba testified that the light sets at issue make up approximately 3 per cent of Minami's projected sales for 1998. Minami offered no evidence tending to show that delays or cancellations of orders of the allegedly infringing light sets will affect Minami's business relationships or customer goodwill to a degree beyond this small percentage of its business.[4]

On the issue of irreparable harm, I find persuasive a case from the Western District of New York which Minami points to, *Del–Rain Corp. v. U.S. Customs Service and Pelko Electric*, 1995 WL 781060, 1995 U.S.Dist. LEXIS 19619, where plaintiff sought a preliminary injunction to enjoin Customs from seizing any of its goods pending a determination that defendant's recordation of its trademark with Customs was invalid. The court denied the motion for a preliminary injunction and granted Customs' motion to dismiss for lack of subject matter jurisdiction, reasoning that there was no actual case or controversy because Customs had caused plaintiff no injury, and also that plaintiff could show no irreparable harm. Because the court in *Del–Rain* pointed to the lack of any claim against the putative trade-

4. Moreover, as Brite Star points out, Minami undertook to print and package its "NET LIGHT" products after it received notice that Brite Star was asserting trademark rights in

"NET LITES", and so brought potential losses upon itself. *See e.g., LeSportsac, Inc. v. K Mart Corporation*, 607 F.Supp. 183, 187 (E.D.N.Y. 1984), *affirmed* 754 F.2d 71 (2d Cir.1985).

mark holder Pelko Electric, Minami argues that it, unlike the plaintiff in *Del–Rain,* is seeking relief from the proper party at the proper time.

I disagree. The court in *Del–Rain* went on to say that the remoteness of plaintiff's harm applied equally to an injunction sought against the trademark holder, and that "the claimed threat from Pelko Electric's recordation lacks the same immediacy that Del–Rain concedes does not create a justiciable controversy with respect to Customs." 1995 WL 781060 \*3, 1995 U.S.Dist. LEXIS 19619 \*11.[5]

While Minami can point to some factors making its harm less remote than that of the *Del–Rain* plaintiff (e.g., that the goods in question have been sold, that they will have the words "NET LIGHT" or "NET LIGHTS" on the packaging, that they will arrive in U.S. ports within the next two months), it still faces a significant unknown factor present in both cases: whether the U.S. Customs Service, after making a meaningful comparison of the goods, will find infringement.[6] It also faces an unknown factor

(at least on the record before me) not present in the *Del–Rain* case: the extent to which a possible detention or seizure of goods already delivered FOB Hong Kong to Minami's customers will cause injury to Minami itself. Although Minami president Juba offered conclusory testimony as to the risk of loss of Minami's business reputation resulting from delays or cancellations of orders, the substance of his testimony was in fact limited to a discussion of costs Minami or its customers would incur if any of its goods were detained by Customs. Direct economic harm (at this point speculative) flowing from a detention or seizure by Customs would be to Minami's customers, not Minami, at least with regard to the 90 per cent which are sold FOB Hong Kong.

Thus, the question is not only whether Minami will suffer irreparable (i.e., not compensable in money damages) harm if the injunction is denied but whether Minami has made a showing that it will suffer any harm absent judicial intervention at this stage? I conclude that it has not.[7]

---

5. In *Del–Rain*, plaintiff was concerned about possible interference with importation of goods not yet ordered, manufactured or shipped.

6. Assuming that Minami could point to an actual or imminent detention or seizure of its good by Customs, I would still be concerned that Minami's request for injunctive relief was premature for failure to exhaust its administrative remedies. *See Miss America Organization v. Mattel, et al.,* 945 F.2d 536 (2d Cir.1991). Customs has not yet had an opportunity to employ its expertise to determine whether, in fact, the goods are infringing and should be detained, and Minami has not yet availed itself of any relief available to it under relevant Customs regulations. There is no question that I have jurisdiction over Minami's action for declaratory judgment of cancellation or noninfringement; the issue, however, is whether the doctrine of exhaustion bars my interference, in the form of a preliminary injunction, with ongoing administrative proceedings. As the court in *Miss America* stated:

[W]ere we to determine that plaintiffs in this case had satisfied the preliminary injunction standard, then this case would not be the exception, but the rule, for every importer would be able to allege the type of injury plaintiffs allege. Such a result would effectively turn the Congressional scheme ... upside down.

945 F.2d at 543.

Plaintiff in *Miss America* argued that it should be exempted from exhaustion requirements because, as Minami alleges in this case, it would

suffer irreparable harm due to delays in filling orders and damage to its reputation as a reliable supplier. (The *Miss America* plaintiff also, like Minami, had seasonal marketing concerns.) The court found these arguments to be "routinely available to any importer that has invested a great deal of money in goods that have been detained", *id.,* and not a basis for an exception to the exhaustion requirement. Although *Miss America* was a copyright infringement case, not a trademark case, and thus involved distinct administrative remedies, the rationale for requiring exhaustion is the same.

7. Cf.,*Simmonds Aerocessories v. Elastic Stop Nut Corp. of America,* 257 F.2d 485 (3d Cir.1958), in which the Court of Appeals held that plaintiff's request for a declaratory judgment that plaintiff is free to manufacture and import its product without interference from defendant or the Customs Service presented an actual case or controversy. This case is distinguishable from *Simmonds* in two significant ways. First, the plaintiff in *Simmonds* had already had its goods seized by the Customs Service, and had withdrawn them to avoid a forfeiture proceeding. Thus the issue of exhaustion was not reached. Furthermore, plaintiff was not seeking a preliminary injunction, and thus did not need to make a showing of irreparable harm. 257 F.2d at 489 ("...as it is not essential to the exercise of the judicial power that an injunction be sought, allegations that irreparable injury is threatened are not required.") (citations omitted).

Because Minami has made no showing of irreparable harm, I do not reach the remaining parts of the preliminary injunction test. Thus, the ultimate issue which will decide the propriety of any seizure by Customs—are the goods infringing or not?—remains to be decided at a trial on the merits, or on dispositive motions after discovery. Minami had notice of Brite Star's assertion of trademark rights on April 29, 1998, and could have filed a declaratory judgment action immediately, with a request for expedited disposition, or requested expedited disposition of its counterclaims once filed. See, e.g., *Platt & Munk v. Republic Graphics*, 315 F.2d 847, 855 (2d Cir.1963)(per J. Friendly) (directing district court to modify status quo injunction order to allow for speedy resolution of claims). By separate order, I will schedule this action for speedy resolution.

**THEREFORE,** this 29th day of July, 1998, **IT IS ORDERED THAT** defendant/counterclaim plaintiff Minami's motion for a preliminary injunction (docket # 4) is **DENIED.**